IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

DR. LUIS B. RIVERA-NAZARIO, *et al.*,

   **Plaintiffs,**

      v.                                    CIVIL NO. 14-1533 (JAG)

CORPORACION DEL FONDO DEL SEGURO
DEL ESTADO, *et al.*,

   **Defendants.**

OPINION AND ORDER

GARCIA-GREGORY, D.J.

On September 16, 2014, a group of licensed chiropractors and chiropractic clinics filed a

suit against Corporacion del Fondo del Seguro del Estado ("CFSE") and several CFSE directors

and officials[1] (collectively "Defendants") alleging violations of federal antitrust laws, U.S.

Constitution, and Puerto Rico law. Docket No. 28. Specifically, Plaintiffs claims arise under: (1)

Sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §§ 1-7. *et seq.*; (2)  Due

Process and Equal Protection Clauses of the United States and Puerto Rico Constitutions, U.S.

Const., amend. XIV, § 1 and P.R. Laws Ann. tit. 1, Art. II, § 7; (3) First Amendment, U.S. Const.,

amend. 1; (4) Contract Clause of the United States and Puerto Rico Constitutions, U.S. Const.,

---

[1] These officials are: Liza M. Estrada ("Estrada") in her official capacity as Administrator of CFSE; Sheila
Rivera-Serrano ("Rivera-Serrano") in her personal and official capacity as Director of the CFSE Medical
Area; Maria I. Lastra-Gonzalez ("Lastra-Gonzalez") in her personal and official capacity as Medical
Director at the CFSE Bayamon Regional Office; Jose Colon-Grau ("Colon-Grau") in his personal and
official capacity as an External Advisor; and Lorena Diaz-Trancon ("Diaz-Trancon") in her personal and
official capacity as a Type VII Internal Medical Council of CFSE.

Art. 1, § 10 and P.R. Laws Ann. tit. 1, Art. II, § 7; and (5) Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141. *Id.*

Pending before the Court are two motions to dismiss under Fed. R. Civ. P. 12(b)(6) filed by Defendants on October 6 and November 20, 2014. Docket Nos. 30 and 44. Plaintiffs opposed each motion to dismiss in a timely manner. Docket Nos. 41 and 45. Defendants, in turn, filed a Reply to Plaintiffs' Oppositions. Docket No. 53. For the reasons outlined below, Defendants' motions to dismiss are GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND[2]

The discrimination against chiropractors in the CFSE goes back to 2003, when Defendant Lastra-Gonzalez denied contracts to several chiropractors, including Plaintiffs, without any reasonable cause. Only after appearing at the CFSE headquarters to protest this decision and fight for their rights, Plaintiffs were able to get their contracts.

Beginning in February 2013 and even to the present day, Lastra-Gonzalez has denied referrals to chiropractors even after the patients' occupational primary care physicians approved the treatment. In May 2004, Lastra-Gonzalez sent an internal memo to the CFSE's regional medical directors instructing them to cease all referrals of new patients for chiropractic treatment during a three-week period. Plaintiffs were not notified of said instruction in violation of their chiropractic service agreements. Moreover, Lastra-Gonzalez began to spread the rumor that the CFSE was in the process of eliminating chiropractic care from the corporation's compensated services due to its harmful side effects and the ineffectiveness of the treatment. To

---

[2] The facts in this section were taken from Plaintiffs' Amended Complaint and are presumed to be true for purposes of Defendants' motions to dismiss. *See* Docket No. 28.

this day, some occupational primary care physicians opt not to refer patients to chiropractors due to the negative and misleading information disseminated by Lastra-Gonzalez in accordance and in agreement with her co-defendants.

On August 9, 2013, the CFSE issued a letter concerning the adoption of new guidelines and policies regarding chiropractic services and patient referrals. The letter discussed in an inflammatory and exaggerated manner the contraindications and side effects of chiropractic treatment. This letter, which was signed by Defendant Rivera-Serrano, was sent to 9 regional directors and 310 occupational primary care physicians, as well as several patients.  In addition, Defendant Diaz-Trancon had an important role in drafting the letter and in elaborating the guidelines and policies contained therein.

In October 2013, Plaintiff Miguel Serrano met with Defendant Rivera-Serrano to discuss the letter and the new policies. Nonetheless, Defendant Rivera-Serrano denied the existence of the letter and expressed that chiropractic care was just an alternative medicine treatment that does not really correct or cure neuromusculoskeletal injuries. As a result of the new policies and the letter, orthopedic spine surgeons, such as Defendant Rivera-Serrano's nephew, Dr. Yamil C. Rivera-Colon, have benefited from a significant rise in the treatment of patients that were previously referred to chiropractors.

On November 12, 2013, Plaintiffs Elvin Siverio-Casanova and Marino Roman met with Defendants Colon-Grau and Rivera-Serrano, who assured them that there were no changes made to the CFSE guidelines and policies. Defendants Colon-Grau and Rivera-Serrano also denied the existence of the letter and expressed that they were unaware of the alleged substantial decrease in the referral of CFSE patients for chiropractic treatment.

Under the new guidelines, an occupational primary care physician that wishes to refer to a chiropractor an injured worker with acute spinal-related conditions must complete a referral form and accompany it with the medical history, relevant physical examination, an Employers' Report, a Special Medical Report, and evidence of previous treatments, consultations, and referral studies. Then, the regional medical director must authorize the chiropractic service and then submit a monthly report to the director of the CFSE Medical Area for her final approval. This regulatory scheme only applied to chiropractors.

Prior to the adoption of the policies, the regional medical director did not have to approve the chiropractic treatment of referred patients. Also, the covered treatment consisted of eighteen (18) visits to be offered in a maximum period of six (6) weeks. The new guidelines and health policy, however, limited chiropractic services to three (3) weekly visits during a maximum period of two (2) weeks. If an extension of the treatment is necessary, the chiropractor must submit a written request to the regional medical director. The director may authorize the treatment, which could be extended for two (2) additional weeks for a total of twelve (12) visits. The chiropractic service agreements, however, establish that the treatment plan will last a maximum of six weeks and/or eighteen chiropractic treatments.

Furthermore, four out of the seven members of the Industrial Medical Council, the body in charge of promulgating and adopting the challenged guidelines, are medical doctors that compete with Plaintiffs in treating injured workers with neuromusculoskeletal conditions. Therefore, Plaintiffs claims that the Industrial Medical Council and Defendants had a competitor's interest in discouraging the use of chiropractic services through CFSE policies.

On June 18, 2014, Plaintiff Juan M. Lopez arrived at the CFSE offices to sign and renew his chiropractic service agreement. Plaintiff Lopez noticed that the new service agreement included an "Attachment A," which was the August 9, 2013 letter signed by Defendant Rivera-Serrano. Since Plaintiff Lopez disagreed with the content of the letter, he refused to sign the contract. Plaintiffs' contracts, including that of Plaintiff Lopez, were set to expire by the end of June 2014.

On July 3, 2014, Plaintiffs filed an original Complaint against Defendants asserting, *inter alia*, violations of the Sherman Act, Due Process Clause, Equal Protection Clause, Contract Clause, and Puerto Rico law. *See* Docket No. 1. On July 10, just seven days after the filing of the original complaint, Plaintiff Roman received an email from the CFSE canceling his already approved service agreement. According to the email, Defendant Estrada decided not to renew Plaintiff Roman's contract and informed him not to attend the scheduled visit where he was supposed to sign the new contract. Finally, the CFSE has failed to renew any of Plaintiffs' service agreements in retaliation for the filing of the original complaint. On September 16, 2014, Plaintiffs filed a Verified Amended Complaint that added a First Amendment retaliation claim as a new cause of action.

## STANDARD OF REVIEW

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). As courts of limited jurisdiction, federal courts have the duty of narrowly construing jurisdictional grants. *See, e.g., Alicea-Rivera v. SIMED*, 12 F. Supp. 2d 243, 245 (D.P.R. 1998). Since the justiciability requirement of standing is generally viewed as a

component of subject matter jurisdiction, *see, e.g., Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1280-81 (1st Cir. 1996), standing challenges are more appropriately brought under Fed. R. Civ. P. Rule 12(b)(1). *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001) (stating that justiciability issues should be analyzed under Rule 12(b)(1)).

Motions brought under Rule 12(b)(1) are subject to the same standard of review as Rule 12(b)(6) motions. *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 27 (1st Cir. 1994). To survive dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1967 (2007). According to *Twombly*, the complaint must state enough facts to "nudge [the plaintiff's] claims across the line from conceivable to plausible." *Id.* at 1974. Therefore, to preclude dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the complaint must rest on factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* at 1965.

At the motion to dismiss stage, courts accept all well-pleaded factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *See Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 51 (1st Cir. 1988). Courts need not address complaints supported only by "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996). Finally, affirmative defenses, such as claims of immunity, may be raised in a motion to dismiss under Fed. R. Civ. P. 12(b)(6) provided that "the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'" *Blackstone Realty LLC v. FDIC*, 244 F.3d 193, 197 (1st Cir. 2001) (quoting *Aldahonda-Rivera v. Parke Davis & Co.*, 882 F.2d 590, 591 (1st Cir. 1989)) (other citations omitted). Accordingly, the Court will evaluate

Defendants' standing challenge, immunity defenses, and arguments regarding the insufficiency of Plaintiffs' allegations under this standard.

## DISCUSSION

Defendants argue that Plaintiffs' Complaint must be dismissed for various reasons. First, Defendants claim that Plaintiffs Lopez-García, Arraiza-Caban, and Velez lack standing to bring the instant lawsuit on the basis that they cannot assert claims on behalf of corporations which had entered into contracts with CFSE or on behalf of corporations which do not exist. Docket No. 30 at 18-29. Second, Defendants contend that a corporation and its officers cannot engage in the type of concerted conduct prohibited by § 1 of the Sherman Act. *Id.* at 32-33. In the alternative, Defendants assert that Plaintiffs failed to make plausible allegations regarding the underlying motive of Defendants' putative anticompetitive conduct. *Id.* at 33-42. Consequently, Defendants suggest that Plaintiffs' allegations are insufficient to state a claim under § 1 of the Sherman Act. *Id.*

Third, with respect to Plaintiffs' claim under § 2 of the Sherman Act, Defendants argue that the Puerto Rico Legislature has granted CFSE with monopoly power in the workers' compensation context. *Id.* at 42-50. As a result, Defendants claim that CFSE is exempt from antitrust laws pursuant to the state action doctrine. *Id.* Moreover, Defendants suggest that the establishment of maximum limitations and the decision not to compensate certain services does not render such actions anticompetitive. *Id.* at 49-50. In addition, Defendants state that Plaintiffs failed to plead any facts showing that any of the individual defendants used CFSE as a subterfuge for their own benefit. *Id* at 50.

Fourth, Defendants also argue that Plaintiffs' allegations fail to state a due process claim because their alleged anticompetitive conduct was neither egregious nor outrageous. *Id.* at 53-55. With respect to Plaintiffs' equal protection claim, Defendants point out that Plaintiffs are not members of a protected class and that there are no allegations suggesting discriminatory intent. *Id.* at 56-57. Fifth, Defendants indicate that there is no particularized conduct alleged in the Complaint that could be attributed to the individual co-defendants that could potentially give rise to a First Amendment retaliation claim. *Id.* at 57-59. Defendants add that CFSE had the authority to refuse to renew any expired contracts without incurring in a violation of the First Amendment. *Id.* at 60-62.

Sixth, with respect to the Contracts Clause claim, Defendants assert that the Complaint fails to allege any state legislative action that could have impaired Plaintiffs' contractual obligations with CFSE. *Id.* at 62-63. Seventh, the individual co-defendants argue that —to the extent Plaintiffs' allegations are sufficient to establish their antitrust and Fourteenth Amendment claims— they are entitled to qualified immunity as to these claims because they did not violate any legal right that was clearly established at the time of the alleged conduct. *Id.* at 64-66. Finally, Defendants ask the Court to refuse to exercise its supplemental jurisdiction in the instant case and dismiss Plaintiffs' Puerto Rico law claims —namely those arising under Article 1802 of the Civil Code and the Due Process, Equal Protection, and Contracts Clauses of the Puerto Rico Constitution. *Id.* at 66.[3]

---

[3] The Court notes that Defendants did not argue that they were entitled to state sovereign immunity under the Eleventh Amendment of the U.S. Constitution. In any event, this Court agrees with the reasoning and holding of Judge Salvador Casellas and Judge Gustavo Gelpí that the CFSE is not an "arm

I. **Standing**

It is well-established that "Article III of the Constitution confines the federal courts to deciding actual cases and controversies." *Cotter v. City of Boston*, 323 F.3d 160, 166 (1st Cir. 2003) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). It is also clear that a case or controversy requires litigants bringing forth a claim to demonstrate their "standing to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982) (quotation marks omitted).

In order to establish standing under Article III, a plaintiff must have a "personal stake in the outcome of the controversy," *see Baker v. Carr*, 369 U.S. 186, 204 (1962), and meet the following three constitutional requirements:

> (1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (i.e., a "fairly . . . treace[able]" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). In addition to these three constitutional requirements, courts have also considered certain prudential factors as part of the standing analysis. Among these considerations are that: (1) a "plaintiff generally must assert his own legal rights and

---

of the State" for purposes of the Eleventh Amendment and state sovereign immunity. *See, e.g., Joubert-Vazquez v. Alvarez-Rubio*, 820 F. Supp. 2d 289, 298-300 (D.P.R. 2011) (Casellas, J.) and *Aponte-Ramos v. Alvarez-Rubio*, 2011 WL 5855313, at *1 (D.P.R. Oct. 28, 2011) (Gelpi, J.).

interests and cannot rest his claim to relief on the legal rights or interests of third parties," *see* *Warth v. Seldin*, 422 U.S. 490, 499 (1975); (2) the alleged injury is not merely a generalized grievance; (3) the alleged injury falls within the zone of interests protected by the law invoked. *N.H. Right to Life Political Action Coomm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996).

Defendants specifically argue that Plaintiffs Lopez-Garcia, Arraiza-Caban, and Velez lack standing to file the instant lawsuit on behalf of their corporations, namely Centro Quiropractico Dr. Juan M. Lopez P.S.C., Grupo Quiropractico del Norte, C.S.P., and Centro Quiropractico de Cayey P.S.C., respectively.[4] Docket No. 30 at 20-21. These corporations were the ones that entered into contracts with CFSE. *Id.* at 23. According to Defendants, since the individual plaintiffs operated through their corporate entities to undertake the various transactions discussed in the Complaint, it follows that these corporations were the ones that could have suffered the alleged harm. *Id.* Defendants invoke the shareholder standing rule for the proposition that, even if Lopez-Garcia, Arraiza-Caban, and Velez were controlling or sole shareholders/officers of their respective corporations, they do not have an individual right to assert any claims on behalf of their clinics. *Id.* at 25-26. Finally, Defendants claim that Lopez-

---

[4] Out of these three chiropractic clinics, only Centro Quiropractico de Cayey P.S.C. is not a plaintiff in this case. In addition, throughout their sixty-eight page motion to dismiss, Defendants consistently argue that Lopez-Garcia's chiropractic clinic and co-plaintiff in this case, Centro Quiropractico Dr. Juan M. Lopez P.S.C., is not properly registered in the Puerto Rico Department of State as an existing and duly incorporated entity. *See, e.g.*, Docket No. 30 at 21 n.12. The Court takes judicial notice, however, that the company is registered as "Centro Quiropractico Dr. Juan M. Lopez, DC P.S.C." *See* Department of State's Corporate Registry of the Commonwealth of Puerto Rico, *available at* https://prcorpfiling.f1hst.com/CorporationSearch.aspx. Since it is evident that we are talking about the same corporate entity, —the one that entered into a service provider contract with CFSE and is owned by Plaintiff Lopez-Garcia— the Court will not address Defendants' argument any further.

Garcia, Arraiza-Caban, and Velez have no standing to file derivative claims on behalf of their respective corporations. *Id.* at 28-29.

Defendants are right in pointing out that "[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." *Pignato v. Dein Host, Inc.*, 835 F.2d 107, 109 (1st Cir. 1987) (quoting *Brictson v. Woodrough*, 164 F.2d 107, 109 (8th Cir. 1947)).[5] Defendants' argument, however, misses the point. Plaintiffs Lopez-Garcia, Arraiza-Caban, and Velez do not seek "to enforce corporate rights or redress injuries to [their respective] corporation[s]." *Id.* Instead, they are seeking redress for alleged injuries that are both separate and distinct from those suffered by their respective corporate entities.  Docket No. 40 at 7-8.

For example, Plaintiffs allege that Defendants have impeded and discouraged patients from seeking treatment by chiropractors, as well as dissuading occupational primary care physicians from referring patients to chiropractors. Docket No. 28 at 27. Moreover, Plaintiffs aver that Defendants have relied on false and misleading information to tarnish their individual reputation and, thus, manipulate the public's perception of chiropractic healthcare.  *Id.* at 27 and 40. In addition, with respect to Plaintiffs' First Amendment retaliation claim, Plaintiffs allege that Defendant Estrada gave specific instructions not to extend or renew any service agreement

---

[5] The First Circuit has recently held that the shareholder standing rule constitutes a prudential factor, as opposed to a constitutional requirement, for the courts to consider as part of the standing analysis. *See Gianfrancesco v. Town of Wrentham*, 712 F.3d 634 (1st Cir. 2013). In other words, courts may circumvent this rule under certain circumstances to reach the merits of the case. *Id.*

to chiropractors, including the individual plaintiffs in this case. *Id.* at 42. Consequently, Lopez-Garcia, Arraiza-Caban, and Velez are not suing on behalf of their respective corporations, but rather, to vindicate their own rights and seek redress of their separate and distinct injuries. *Cf. Diva's Inc. v. City of Bangor*, 411 F.3d 30, 42 (1st Cir. 2005) (dismissing the individual plaintiff for lack of standing because he failed "to allege any injury, separate from the injury" to the corporation).

Since it cannot be said at this stage that Lopez-Garcia, Arraiza-Caban, and Velez's only stake in this litigation is to enforce the rights of their respective corporations, it necessarily follows that they have standing to file the Complaint at bar.

## II.    Sherman Antitrust Act Claims

Plaintiffs allege violations of both Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Docket No. 28 at 43-46. Specifically, Plaintiffs base their antitrust claims on the adoption of the new CFSE guidelines and health policy for chiropractic services, which limit chiropractic treatment to two (2) weeks with a frequency of three (3) visits per week. Docket No. 28 at 31.[6] The guidelines allow the Regional Medical Director to authorize the treatment's extension to two (2) additional weeks for a total of twelve (12) visits.  *Id.* According to the Complaint, these guidelines reflect Defendants' animus towards chiropractic treatment and their clear disregard of accepted practices and scientific data. *Id.* at 43-46. In other words, the Complaint avers that Defendants, individually and acting in concert, adopted discriminatory and anticompetitive

---

[6] It is unclear from the face of the Amended Complaint whether Plaintiffs base their antitrust claims on any other actions besides the limitation of chiropractic services through the adoption of the alleged discriminatory guidelines.

policies that ultimately excluded and eliminated chiropractic treatment from the medical and health compensation provided under Act No. 45 of April 18, 1935, as amended, P.R. Laws Ann. tit. 11, § 1-42 ("Act No. 45"). Docket No. 28 at 4.

Defendants claim that since the CFSE is a public corporation with state-sponsored monopoly power over workers' compensation claims, it follows that CFSE is immune from antitrust challenges pursuant to the state action (or *Parker*) doctrine. Docket No. 30 at 43-46. With this in mind, the Court proceeds to analyze Defendants' immunity argument.

## A.  The State Action Doctrine

The state action doctrine immunizes state efforts to displace competition with regulation from federal antitrust laws.[7]  In *Parker v. Brown*, the Supreme Court held that the Sherman Act does not prohibit a State in its sovereign capacity from imposing anticompetitive restraints that would otherwise be impermissible. 317 U.S. 341, 351-52 (1943); *see also F.T.C. v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1010 (2013) (citation omitted) (quotation marks omitted) ("[B]ecause nothing in the language of the Sherman Act or in its history suggested that Congress intended to restrict the sovereign capacity of the States to regulate their economies, the Act should not be read to bar States from imposing market restraints as an act of government.").

---

[7] The term "state action" should not be confused with our constitutional analysis under the Fourteenth Amendment. Unlike Fourteenth Amendment state action, the concept of "state action" for antitrust immunity purposes does not cover "inadvertent or unilateral acts of state officials not acting pursuant to state policy." 1 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶221, p. 356 (2d ed. 2000) (Areeda & Hovencamp).

While *Parker* antitrust immunity has been extended to state subdivisions (e.g., agencies and public corporations) and private parties that act pursuant to the sovereign power of the State, it is clear that these nonsovereign entities "do not receive all the federal deference of the States that create them." *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412-13 (1978) ("[T]he *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by it subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service."). A state subdivision invoking *Parker* immunity has the burden to establish that it acted "pursuant to a clearly expressed state policy." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 40 (1985). In doing so, the state subdivision need not "point to a specific, detailed legislative authorization," but rather, show that the "legislature contemplated the kind of action complained of." *Louisiana Power & Light*, 435 U.S. at 415; *see also Corey v. Look*, 641 F.2d 32, 36-37 (1st Cir. 1981). This burden, also known as the "clear articulation" requirement, is met so long as the challenged action is a reasonable foreseeable consequence of the state's authorization. *Id.*

In addition to the "clear articulation" requirement, private actors seeking *Parker* immunity must prove that their anticompetitive acts were "actively supervised by the State." *California Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). Up until recently, it was unclear whether formal state agencies and political subdivisions were subject to *Midcal's* "active state supervision" requirement. In 2013, the Supreme Court stated that, "unlike private parties, [local governmental] entities are not subject to the 'active state supervision requirement' because they have less of an incentive to pursue their own self-interest under the

guise of implementing state policies." *Phoebe Putney*, 133 S. Ct. at 1011 (citing *Hallie*, 4712 U.S. at 46-47). Earlier this year, however, the Supreme Court clarified that its holding in *Phoebe Putney*, was premised on the fact that the "need for supervision turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade." *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101, 1113-1114 (2015) (citing 1A Areeda & Hovencamp, *Antitrust Law* ¶ 226, p. 180 (4th ed. 2013)) ("State agencies controlled by active market participants, who possess singularly strong private interests, pose the very risk of self-dealing *Midcal* 's supervision requirement was created to address.").

In *Board of Dental Examiners*, the Supreme Court held that "*MidCal's* active supervision test is an essential prerequisite of *Parker* immunity for any nonsovereign entity —public or private— controlled by active market participants." *Id.* at 1113. The Court also stated that "[w]hen a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest." *Id.* at 1114. Given that the Supreme Court issued its *Board of Dental Examiners* decision on February 25, 2015, the parties have been unable to brief this Court on whether CFSE is a nonsovereign entity controlled by active market participants and, thus, subject to the supervision requirement.

Plaintiffs argue that the individual defendants "are engaged in the private practice of medicine in areas of specializations that directly compete with chiropractic services in the market for healthcare . . . and the submarket for treatment of neuromusculoskeletal conditions." Docket No. 41 at 11. Nonetheless, Plaintiffs' position in their Opposition was that Defendants'

actions were not subject to the "active state supervision requirement." *Id.* at 17-18. Interestingly enough, Defendants assumed the contrary position that "the challenged restraint must be one clearly articulated and affirmatively expressed as state policy and . . . *actively supervised* by the state itself." Docket No. 30 at 45 (citing *Corey v. Look*, 641 F.2d 32, 36-37 (1st Cir. 1981)) (emphasis added). Defendants mention in passing that the CFSE is "actively supervised" because "it is restricted in the types of actions it can undertake through [Act No. 45]." *Id.* at 47. Nevertheless, a cursory reading of any case discussing the nature of this requirement would suffice to conclude that this argument is completely circular and fails as a matter of law.

Consequently, not only have the parties been unable to discuss the impact of *Board of Dental Examiners* on this case, but also, they seem to be confused as to what is the applicable test. Furthermore, although it is well-established that individuals may qualify for *Parker* antitrust immunity, it was unclear from Defendants' motions to dismiss whether they are claiming that only the CFSE would benefit from such immunity in this case. *See Llewellyn v. Crothers*, 765 F.2d 769 (9th Cir. 1985) (Kennedy, J.) (affirming the district court's dismissal of a lawsuit brought by licensed chiropractors on the basis that the director and medical directors of the Oregon Workers' Compensation Department, along with Oregon's State Accident Insurance Fund Corporation, were immune from antitrust liability). In any event, in *Board of Dental Examiners*, the Supreme Court specifically reserved the question of whether a private board member of a public entity —that is, an individual who exercises public authority but also actively participates in the relevant market— could qualify for state-action immunity. 135 S. Ct. at 1115.

Leaving aside the *Parker* immunity issue, the parties' analysis of the federal antitrust claims, while wordy and extensive, was lacking in substance to the say the least. For example, Defendants mention in passing that § 1 of the Sherman Act does not reach unilateral conduct. Docket No. 30 at 32-33. Defendants claim that a corporation and its officers cannot engage in the type of concerted conduct prohibited under § 1 because they "are deemed to be the same legal entity for purposes of the Sherman Act." *Id.* at 33 (citing *Podiatrist Ass'n, Inc. v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 13 (1st Cir. 2003)). The Supreme Court, however, has constantly rejected the formalistic approach of the intraenterprise conspiracy doctrine in favor of a more functional approach. *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2211 (2010). Instead of looking at whether the defendants are "a legally single entity," courts must determine whether the alleged conspiracy or agreement "deprives the marketplace of independent centers of decisionmaking . . . and thus of actual or potential competition." *Id.* at 2211-2212 (citations and quotation marks omitted). Not only did Defendants recite the law incorrectly, but also, they failed to apply any legal test to the facts in the instant case. *See id.* at 32-33.[8] Similarly, Defendants did not explain whether the "independent personal stake exception" invoked by Plaintiffs could apply in this case.

Another example is the parties' perfunctory discussion of the qualified immunity defense. Without much specificity or analysis, Defendants claim that Plaintiffs failed to plea or show that Defendants' actions —namely, limiting the number of compensated referrals—

---

[8] For what it is worth, Plaintiffs incorrectly referenced the defunct intraenterprise conspiracy doctrine as applicable and also failed to identify the correct legal standard. *See* Docket No. 41 at 10-13.

violated clearly established antitrust law. Docket No. 30 at 65.[9] This argument is conclusory and lacks substance. "It is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). From the Motion to Dismiss and the quality of the analysis, this seems to be exactly what Defendants pretended the Court to do. On the other hand, Plaintiffs did not even acknowledge Defendants' qualified immunity defense.[10] Similarly, Plaintiffs failed to cite any caselaw or even argue that the alleged violations in fact violated clearly established law. Since "[j]udges are not expected to be mindreaders," the parties had "an obligation to spell out [their] arguments squarely and distinctly." *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) (internal citations omitted). None of the parties complied with this obligation as to the antitrust claims.

Given that many of the defenses and arguments were not briefed properly, the Court hereby refuses to do counsel's work and, therefore, denies Defendants' motions to dismiss the antitrust claims *without prejudice*. In the interest of justice and efficiency, the Court will allow Defendants to renew their Motion to Dismiss only as to the these claims. Plaintiffs, in turn, will

---

[9] This is the extent of Defendants' analysis. The Motion to Dismiss consists of a two-page, boilerplate summary of what the defense of qualified immunity entails and a small paragraph indicating that the individual defendants are entitled to this defense. Defendants' analysis did not even recognize a distinction between Plaintiffs' antitrust claims under § 1 and § 2 of the Sherman Act. *See* Docket No. 30 at 65.

[10] Defendants only raised a vague qualified immunity defense as to Plaintiffs' Sherman Act and Fourteenth Amendment claims. *See* Docket No. 30 at 64-66. Nonetheless, Defendants' arguments were unopposed because Plaintiffs only responded to a non-existent qualified immunity defense with respect to the First Amendment retaliation claim. *See* Docket No. 41 at 30-31. The Court is perplexed at such a degree of carelessness.

be entitled to file a joint Opposition. To the extent that Defendants renew their Motion to

Dismiss, the parties' briefs shall be limited to the following topics:

1. *Parker* immunity defense
> (a) whether, in light of the unresolved question in *Board of Dental Examiners*, the individual defendants could qualify for *Parker* immunity;
> (b) whether Defendants acted pursuant to a clearly articulated state policy;[11]
> (c) whether the "active state supervision" requirement applies and, if so, whether it is met in the instant case;

2. Section 1 of the Sherman Act
> (a) whether the CFSE and the individual defendants could engage in the type of concerted conduct required by § 1 as discussed in *American Needle*;
> (b) whether the "independent personal stake exception" is applicable;
> (c) to the extent that Plaintiffs' allegations stated a claim under § 1, whether Defendants' conduct violated clearly established law as discussed in the relevant caselaw;

3. Section 2 of the Sherman Act
> (a) whether Plaintiffs' allegations stated a claim under § 2;
> (b) to the extent that Plaintiffs stated a claim, whether Defendants' conduct violated clearly established law as discussed in the relevant caselaw.

The Court hopes that this outline will assist the parties write clearer briefs and avoid

unnecessary wordiness. To make sure this happens, no replies will be allowed and the briefs

shall not exceed fifteen (15) pages.[12] In addition, the parties are hereby advised that failure to

comply with the aforementioned specifications shall result in the filing being stricken from the

docket.

---

[11] The parties' discussion of this requirement was quite comprehensive. Therefore, the parties may rely on the arguments that were already raised.

[12] The Court expects the font and margins to comply with Rule 7(d) of the Local Rules of Civil Procedure. Failure to comply with such rules shall result in the filing being stricken from the record.

### III.    Due Process Clause

Plaintiffs argue that the adoption of the new guidelines was unreasonable, arbitrary, and capricious.[13] *See* Docket No. 41 at 20.  Aside from this vague contention, Plaintiffs' analysis of their substantive due process claim is borderline frivolous. For example, Plaintiffs argue that the proper standard of review is one of "strict scrutiny due to the infringement of [their] personal constitutional rights." Docket No. 41 at 22. The Court does not know what infringement or constitutional rights Plaintiffs are referring to or how do they reach such an unsupported conclusion. Plaintiffs proceed to argue that "[i]n any event, Defendants have failed to show any kind of legitimate state interests at stake under both rational and strict constitutional scrutiny . . . [and, thus,] the requirements for a Due Process claim are clearly satisfied." *Id.* This argument is devoid of any substance. Not only did Plaintiffs fail to explain their reasoning, but also, their discussion does not seem to resemble in any way how courts traditionally analyze substantive due process claims.

In light of the allegations stated in the Amended Complaint, "the threshold question is whether [Defendants'] behavior . . . [was] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 (1st Cir. 2010) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998) (internal quotation marks omitted). "Substantive due process protects only those interests that implicate one of

---

[13] Defendants claim that Plaintiffs failed to specify which component of the Due Process Clause was allegedly violated. *See* Docket No. 30 at 52-53. As a result, Defendants felt the need to analyze Plaintiffs' allegations under both substantive and procedural due process theories. *Id.* The Amended Complaint, however, clearly states in bold and capital letters that Plaintiffs only alleged violations of their substantive due process rights. *See* Docket No. 28 at 46. Plaintiffs confirmed the obvious in their main Opposition. *See* Docket No. 41 at 20.

'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 880 n. 13 (citation and internal quotation marks omitted). It is also worth noting that "[s]ubstantive due process, as a theory of constitutional redress has in the past fifty years been disfavored, in part because of its virtually standardless reach." *Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 41-42 (1st Cir. 1992).

The Court agrees with Defendants that it cannot be seriously argued that the challenged actions in this case were either egregious or outrageous. Plaintiffs failed to explain what fundamental right "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty" was infringed. *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (citations omitted). Also, Plaintiffs failed to point out how Defendants deprived them of a protected interest in life, liberty, or property. *See Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (stating that to establish a substantive due process violation by executive officials, the plaintiff must show "both that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property") (emphasis added). Moreover, limiting the number of compensated referrals hardly constitutes conduct that is either "shocking or violative of universal standards of decency." *Amsden v. Moran*, 904 F.2d 748, 753-754 (1st Cir. 1990); *c.f. Rochin v. California*, 342 U.S. 165 (1952) (holding that an officer's conduct in pumping suspect's stomach so as to uncover illicit drugs was conduct that "shock[ed] the conscience" in violation of the suspect's substantive due process rights). This Court refuses to hold that the adoption of a treatment schedule limitation for chiropractic services violated Plaintiffs' substantive due process rights and, thus, hereby dismisses the claim.

Civil No. 14-1533 (JAG)                                                                        22

IV.     **Equal Protection Clause**

The Fourteenth Amendments' Equal Protection Clause guarantees that "no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." *Walsh v. Massachusetts*, 618 F.2d 156, 158 (1st Cir. 1980) (citation omitted). In the instant case, Plaintiffs concede that Defendants' actions are only subject to rational basis review —namely, whether the challenged action was rationally related to a legitimate state interest. Docket No. 41 at 23. Taking the allegations in the Amendment Complaint as true, the Court finds as a matter of law that Plaintiffs have failed to state an equal protection violation.

It is well-established that "[t]he state has broad authority and discretion in the regulation of economic affairs." *Crothers*, 765 F.2d at 775 (citing *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955)). Plaintiffs describe the adopted guidelines as an "oppressive regulatory scheme" that explicitly targets chiropractors and deliberately excludes "other medical professionals involved in the treatment of neuromusculoskeletal disorders and conditions." Docket No. 41 at 24. According to Plaintiffs, this inequity is evidence of Defendants' discriminatory animus towards chiropractors. *Id.*

The Court disagrees with Plaintiffs' exaggerated characterization of the adopted guidelines. Reducing the maximum number of compensated referrals from eighteen (18) to twelve (12) visits hardly constitutes an "oppressive regulatory scheme."[14] The Amended

---

[14] It is worth noting that this number only refers to the maximum amount of compensated referrals under the CFSE. The adopted guidelines at no point prevent injured workers from seeking additional treatment so long as they pay those expenses out of their own pocket. *See* Docket No. 28 at 11.

Complaint itself acknowledges that Defendants' "determination to limit the quantity of treatment sessions [was] based on the Council on Chiropractic Guidelines and Practice Parameters approved by the American Chiropractic Association." Docket No. 28 at 31. This shows that the adopted guidelines were not pulled out of thin air and, much less, were motivated by invidious discrimination.[15]

The Amended Complaint proceeds to mention that various nationally-recognized guidelines allow for substantially more chiropractic treatment than what the adopted guidelines provide for. *Id.* Equal protection principles, however, do not require that the CFSE engage in what Plaintiffs consider to be the "ideal" chiropractic practice. In Act No. 45, the Puerto Rico legislature authorized the CFSE to adopt medical guidelines prescribing, *inter alia*, the maximum treatment period for each condition.  P.R. Laws Ann. tit. 11, § 1b-4 and 1c(b). In addition, the legislature articulated the need of the state to reduce costs in the area of worker's compensation health care. *See* P.R. Laws Ann. tit. 11, § 1a (articulating Puerto Rico's public policy to reduce health care costs by minimizing the prospect for litigation and providing a single compensation system).  Since reducing the number of compensated referrals certainly minimizes costs in this area, it follows that the adopted guidelines and Defendants' actions were rationally related to a legitimate governmental purpose.[16]

---

[15] This analysis applies with equal force to Plaintiffs' substantive due process claim as it is evidence that the guidelines were neither arbitrary nor capricious. This is one of many examples in which equal protection principles prove to be instructive as to the applicability and meaning of the due process clause.

[16] Even if this is not the reason articulated by Defendants when adopting the guidelines, "[t]he burden is on the plaintiff to disprove every conceivable basis which might support the classification, 'whether or

Furthermore, even if the reason to adopt the challenged guidelines was to minimize the risks and side effects associated with chiropractic care, there is no question that limiting the maximum number of compensated referrals is rationally related to such purpose.  Also, assuming *arguendo* that chiropractors and health professionals involved in the treatment of neuromusculoskeletal disorders are similarly situated in terms of the treatments' side effects and contraindications, the Equal Protection Clause allows Defendants to act "one step at a time." *See Williamson*, 348 U.S. at 489. In other words, Defendants were not required to reduce the number of compensated referrals to other professionals engaging in similar treatments. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (citations omitted) ("In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.").

Since "each profession has its own distinctive qualifications and licensing requirements," this Court concludes that there is a rational basis to distinguish between chiropractors and other healthcare providers. *Crothers*, 765 F.2d at 776 (finding that there was a "rational basis to distinguish between chiropractors and other healthcare providers in setting reasonable rates of reimbursement for their services."); *see Giacalone v. Wehner*, 387 F. Supp. 2d 383, 385-385 (S.D.N.Y. 2005) (dismissing an equal protection claim on the basis that there is a "rational basis for distinguishing chiropractors from physical therapists in the setting of rates for the workers'

---

not the basis has a foundation in the record.'" *Giacalone v. Wehner*, 387 F. Supp. 2d 383, 385-385 (S.D.N.Y. 2005) (quoting *Heller v. Doe*, 509 U.S. 312, 320-321 (1993)).

compensation and no-fault insurance programs").[17] As such, the Court finds that no equal protection violation was properly alleged. Plaintiffs' equal protection claim is hereby dismissed.

## V.      First Amendment Retaliation

Plaintiffs allege that Defendants' decision "to revoke and withdraw the already approved chiropractic services agreements just a few days after [the filing] of their original complaint" constitutes an adverse and retaliatory action against them for their exercise of First Amendment rights —specifically, the right to petition the Government for redress of grievances. Docket No. 28 at 50-51. Defendants, in turn, ask this Court to dismiss Plaintiffs' First Amendment retaliation claim because the chiropractic service agreements had already expired. Docket No. 30 at 58-62.[18] Specifically, Defendants claim that Plaintiffs had no property interest in the renewal of their expired contracts and that the CFSE contracts included a no litigation clause. *Id.*[19] It

---

[17] While Plaintiffs seem to suggest that the actions giving rise to their equal protection claim was the adoption of the new guidelines, the Court notes that the same reasoning applies to the inclusion of "Attachment A" to the new contracts. *See* Docket No. 28 at 38-39. Defendants were not required to include the same attachment to the new contracts of other health professionals because: (1) there is a rational basis to distinguish chiropractors from the other healthcare providers; and (2) the Equal Protection Clause allows Defendants to act one step at a time.

[18] It is not clear whether Plaintiffs' contracts had already expired or were in fact terminated. On the one hand, Plaintiffs' Opposition states that Defendants "revoked and withdrew the already approved . . . agreements just a few days after Plaintiffs filed their Complaint." Docket No. 41 at 24. According to the Amended Complaint, however, only Plaintiff Roman's contract was authorized for renewal and then revoked. *See* Docket No. 28 at 42-43. The other contracts had already expired and the CFSE chose not to extend or renew the service agreements. *Id.* Therefore, it appears that the alleged retaliatory action in this case was the non-renewal of Plaintiffs' contracts with CFSE.

[19] According to Defendants, both the expired and the new proposed contracts included the following no litigation clause: "The Provider certifies that he or she currently has no litigation in process against any instrumentality of the Government of the Commonwealth of Puerto Rico, or any of its municipalities." Docket No. 30 at 60-61. This information was included as an Exhibit to the Motion to Dismiss. *Id.*, Ex. 1. Therefore, Defendants essentially ask this Court to look beyond the four corners of the Amended Complaint at this early stage of the case.

follows, according to Defendants, that the CFSE was within its right to refuse to renew the contracts. *Id.* Had Defendants bothered to conduct a scintilla of research, they would have realized that, not only did they fail to recite the law correctly, but also, their arguments fail as a matter of law.

First, the argument that Plaintiffs' claim should be dismissed because they had no property interest in the renewal of expired contracts is clearly wrong. The First Circuit has repeatedly held that "[f]or purposes of First Amendment retaliation claim, the non-renewal of an [independent contractor or] employee's contract constitutes an adverse employment action." *Id.* at 29 (citing *Barton v. Clancy*, 632 F.3d 9, 26 (1st Cir. 2011) ("First Amendment protections apply with equal force whether the public employee is terminated from a position or not reappointed.").

Second, the argument that the no litigation clause in Plaintiffs' contracts authorized the CFSE to refuse to continue contracting with Plaintiffs misses the point.[20] In *Del Valle Group v. Puerto Rico Ports Authority*, this Court enjoined a government-owned corporation from enforcing a similar no litigation clause in its awarded contracts. 756 F. Supp. 2d 169, 180-183 (D.P.R. 2010). In that case, the Court found that using this language against government contract bidders likely constituted a violation of a prospective bidder's First Amendment right to petition the government for redress. *Id.*; *see also Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378, 385-

---

[20] Defendants argue that this no litigation clause "does not contravene Puerto Rico's laws, morality, or the public order." Docket No. 30 at 62. Defendants, however, fail to explain why or how that is the case. They also fail to cite any authority in support of such proposition. Therefore, this is yet another conclusory argument lacking substance.

386 (5th Cir. 2006) (holding that the city's rejection of the lowest bidder because of a previously

filed lawsuit against the city could violate the bidder's First Amendment rights).[21]

It is clearly established that "as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions . . . for speaking out."

*Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011) (citation omitted). This right, however, is not

absolute. In deciding whether a plaintiff successfully states a First Amendment retaliation claim,

courts must conduct a three-part inquiry. First, it must determine "whether the employee spoke

as a citizen on a matter of public concern." *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418

(2006)) (other citation omitted). Then, it must balance "the interests of the [employee], as a

citizen, in commenting upon matters of public concerns and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (other citation omitted). Finally, the

court must determine whether "the protected expression was a substantial or motivating factor

in the adverse employment decision." *Id.* (citation omitted). Even if a plaintiff satisfies this three-

part inquiry, a defendant "may still escape liability if it can show that it would have reached the

same decision even absent the protected conduct." *Id.* at 29-30 (citations and quotation marks

omitted).[22] Finally, this First Amendment framework for government-employee speech also

---

[21] Both *Del Valle Group* and *Oscar Renda* involved contract bidders that lacked a pre-existing relationship with the state. Therefore, if anything, the reasoning in these decisions becomes even more forceful in the instant case where the Complaint alleges that Plaintiffs were independent contractors with pre-existing contractual relationships.

[22] Both parties fail to utilize, or even recognize, this three-part inquiry. Once again, the parties "leav[e] the court to do counsel's work, create the ossature for the[ir] argument[s], and put flesh on [their] bones." *See Zannino*, 895 F.2d at 17.

applies to independent contractors. *Id.* at 26 n. 1 (citing *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 685 (1996)).

With respect to the first prong, a lawsuit "constitutes speech protected under the First Amendment if it 'address[es] a matter of public concern." *Sanders v. Dist. of Columbia*, No. 06-1411(PLF), 2015 WL 1567898, at *6 (D.D.C. Apr. 7, 2015) (quoting *Pearson v. Dist. of Columbia*, 644 F. Supp. 2d 23, 44 (D.D.C. 2009)) (other citation omitted). It is well settled that "[s]peech is a matter of public concern when it 'concerns issues about which information is needed or appropriate to enable members of society to make informed decisions about the operation of their government.'" *Id.* (quoting *LeFande v. Dist. of Columbia*, 613 F.3d 1155, 1159 (D.C. Cir. 2010)) (other citation omitted); *Decotiis*, 635 F.3d at 30 (stating that "official malfeasance or the neglect of duties" are examples of "speech [that] relates to a matter of inherent public concern.").

In the instant case, the Complaint alleges that Defendants relied on false and misleading information to adopt discriminatory guidelines that reduced the number of compensated referrals and harmed the reputation of chiropractors. *See* Docket No. 28. It follows that, as Plaintiffs correctly point out, this lawsuit relates to a health-related public concern regarding the access of injured workers to chiropractic treatment under Act No. 45. Docket No. 41 at 25.

In addition to touching upon a matter of public concern, the allegations make clear that the speech at issue in the lawsuit was not made pursuant to the Plaintiffs' employment duties. *See Decotiis*, 635 F.3d at 30 (quoting *Garcetti*, 547 U.S. at 421-423) (stating that speech made pursuant to employment duties include "speech that 'owes its existence to a public employee's professional responsibilities' speech that the employer 'has commissioned or created', speech that the employee 'was paid to' make, speech that the employee's 'duties . . . required him to'

make, speech that amounts to the employee's 'work product', and speech that is an ' official communication[ ]'"). Therefore, the Court finds that the Complaint alleged sufficient facts to conclude that Plaintiffs spoke as citizens on a matter of public concern when they filed the original lawsuit. *See id.* at 31 (finding that a "public employee who is hired to perform certain specific functions [who] believes her employer is not complying with the law and suggests to constituents a method to exert pressure on the public agency to encourage compliance" is speaking as a citizen on a matter of public concern).

With respect to the second prong, the Court must "balance the value of an employee's speech . . . against the employer's legitimate government interest in 'preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.'" *Id.* (quoting *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52 (1st Cir. 2003)) (other citations omitted). When evaluating the government's interest, courts must consider "(1) the time, place, and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision." *Id.* (quoting *Davignon v. Hodgson*, 524 F.3d 91, 104 (1st Cir. 2008)).

In the instant case, just by looking at the allegations, the value of Plaintiffs' speech seems significant given the fact that the CFSE is the sole provider of medical services for work-related accidents. On the Defendants' side, there are no allegations of major disruptions to the CFSE's operations. Plaintiffs' protected speech came in the form of a lawsuit, as opposed to some kind of protest or manifestation that could disrupt Defendants' services. Also, accepting the pleaded facts as true, "the sole motivation behind the non-renewal was retaliation, not the furtherance of

governmental interests." *Id.* at 36.[23] Therefore, it cannot be said at this stage that Defendants' interest "in allaying disruption and inefficiencies in the workplace" outweighs the value of Plaintiffs' protected speech. *Id.* at 35-36.[24] Similarly, since Plaintiffs' protected speech was the reason for Defendants' alleged retaliatory conduct, it follows that the third prong was met and that Plaintiffs properly stated a First Amendment retaliation claim.

Finally, the Court notes that the Amended Complaint failed to link Defendants Lastra-Gonzalez, Diaz-Trancon, Rivera-Serrano, and Colon-Grau to any actionable conduct that could potentially violate the First Amendment. Plaintiffs had the burden "to allege facts linking each defendant to the grounds on which that particular defendant is potentially liable." *See Redondo Waste Sys., Inc. v. Lopez-Freytes*, 659 F.3d 136, 140 (1st Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). With respect to their First Amendment claim, Plaintiffs' failure to satisfy this burden is evident. Plaintiffs were not allowed to lump Defendants together without pleading individualized facts. The Amended Complaint only identifies the CFSE and Defendant Estrada as those responsible for the decision not to renew the expired chiropractic service agreements.

---

[23] For some reason the Court will never quite understand, Defendants' Motion to Dismiss seems to confirm that Plaintiffs' original lawsuit was the real reason behind the non-renewal of Plaintiffs' contracts. *See* Docket No. 30 at 60-62. Even more surprisingly, Defendants seem to even justify their alleged retaliatory conduct. For example, Defendants state: "Plaintiffs want to proverbially have their cake and eat it too; they want to sue their former contractual partner yet still receive business via the [CFSE's] referrals. No individual or private entity would tolerate such behavior and the [CFSE] cannot be expected to do the same . . . ." *Id.* at 61. This appears to be a truly unwise admission by Defendants that, if taken literally, would seem to confirm Plaintiffs' allegations of retaliation.

[24] Given the "fact-intensive nature" of this First Amendment framework for government-employee speech, the First Circuit has stated that the analysis under the framework's first two prongs "does not easily lend itself to dismissal on a Rule 12(b)(6) motion." *Decotiis*, 635 F.3d at 35 (citing *Jordan v. Carter*, 428 F.3d 67, 73 (1st Cir. 2005)).

*See* Docket No. 42-43.[25] Therefore, the Court dismisses Plaintiffs' First Amendment claim as to Defendants Lastra-Gonzalez, Diaz-Trancon, Rivera-Serrano, and Colon-Grau.

## VI.   Contracts Clause

Plaintiffs' next cause of action is premised on the Contract Clause of the U.S. Constitution, which prohibits states from passing laws "impairing the Obligations of Contracts . . . ." U.S. Const. Art. 1, § 10. A Contract Clause claim requires the court to "first ascertain whether a change in state law has resulted in the substantial impairment of a contractual relationship" and, then, determine "whether the impairment is nevertheless justified as reasonable and necessary to serve an important public interest." *Parker v. Wakelin*, 123 F.3d 1, 4-5 (1st Cir. 1997) (citations and internal quotation marks omitted). A Contract Clause violation also requires that the alleged impairment arises out of a legislative action. *See id.* This is because the Contract Clause "is aimed at the legislative power of the State, and not at the decisions of its courts, the acts of administrative or executive boards or officers, or the doings of corporations or individuals." *New Orleans Waterworks Co. v. La. Sugar Ref. Co.*, 125 U.S. 18, 30 (1888); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978).

The Amended Complaint alleges that Defendants' arbitrary and discriminatory guidelines substantially impaired their contractual relationship with the CFSE. *See* Docket No. 28 at 48-49. For purposes of their motions to dismiss, Defendants do not seem to contest that

---

[25] In their Motion to Dismiss, Defendants correctly noted the Amended Complaint's lack of specificity as to this claim. *See* Docket No. 30 at 59 and Docket No. 44. The Court notes that this argument went unopposed as Plaintiffs fell silent in their Opposition and continued to lump Defendants together in violation of the standard articulated in *Iqbal. See* Docket No. 41 at 24-26.

Plaintiffs have adequately pled the existence of a contractual relationship that was substantially impaired. Instead, Defendants claim that Plaintiffs failed to state a viable Contract Clause claim because they failed to allege that the impairment resulted from a legislative action. *See* Docket No. 30 at 63.

It is clearly established that "it is not strictly and literally true that a law of a state, in order to come within the constitutional prohibition, must be either in the form of a statute enacted by the legislature in the ordinary course of legislation, or in the form of a constitution established by the people of the state as their fundamental law." *New Orleans Waterworks Co.*, 125 U.S. at 30. In fact, "[a]ny enactment, from whatever source originating, to which a state gives the force of law, is a statute of the state, within the meaning of the [Contract Clause]." *Id.* at 31 (quoting *Williams* v. *Bruffy*, 96 U.S. 176, 183 (1877)). The relevant question then is whether the challenged CFSE guidelines involved an exercise of legislative power.

In the instant case, it is clear that the limitation on the number of compensated referrals is not an act of legislative power, but rather, an administrative one. The fact that Act No. 45 authorized Defendants to issue guidelines prescribing the maximum treatment period for medical conditions does not mean that there was an "attempt on the part of the state and its officials to use the law . . . to repudiate a contractual obligation." *Smith v. Sorensen*, 748 F.2d 427, 436-37 (8th Cir. 1984) (citation and internal quotation marks omitted) (holding that the drafting of a reduction-in-force guideline interpreting the merit system rules created by the State was an administrative act and, thus, did not violate the Contract Clause).

Courts have defined "'legislative power' as the lawmaking power of a legislative body involving actions that relate to subjects of permanent or general character." *Skoutelas v. Port Auth. of Allegheny Cnty.*, 2008 WL 1773876, at *4 (W.D. Pa. Apr. 16, 2008) (citing *Black's Law Dictionary* 900 (6th ed.1990)) (other citation omitted); *see also Contemporary Music Group, Inc. v. Chicago Park Dist.*, 343 F.Supp. 505, 508 (N.D. Ill. 1972). The guidelines at issue relate only to the number of compensated referrals for chiropractors within the CFSE and, thus, cannot be described as topics of "permanent or general character." *Compare Skoutelas*, 2008 WL 1773876, at *4 (holding that, although the Internal Revenue Code authorized governmental employers to create a trust to pay certain pension benefits, the port authority's discontinuance of said benefits to current retirees and future plan participants was an administrative act and did not involve an exercise of legislative power) *with New Orleans Waterworks Co.*, 125 U.S. at 30-31 (citing *Murray v. Charleston*, 96 U. S. 432, 440 (1877)) (stating that "the power of determining what persons and property shall be taxed belongs exclusively to the legislative branch of the government, and, whether exercised by the legislature itself, or delegated by it to a municipal corporation, is strictly a legislative power."). Since the guidelines fell shy of resembling a legislative act of "permanent or general character" or "possess[ing] any of the characteristics of a law of general application," it cannot be said that they involved an exercise of legislative power delegated by the Puerto Rico legislature. *Skoutelas*, 2008 WL 1773876, at *4; *see also Montauk* Bus Co., Inc. v. Utica City School Dist., 30 F. Supp. 2d 313 (N.D.N.Y. 1998) (denying Contract Clause claim because the school district's actions relating to bus contract were not legislative acts).

In Act No. 45, the Puerto Rico legislature authorized the creation of medical guidelines to govern the CFSE's services and specifically prescribed what those guidelines must include. *See*

P.R. Laws Ann. tit. 11, § 1b-4 and 1c(b). Therefore, all that was left to the CFSE to do was to determine the maximum period of treatment and the number of compensated referrals. *See id.* In other words, since "[t]he rule was established by the legislature, and its execution . . . committed to the [CFSE]," it necessarily follows that "[t]he power conferred upon the [CFSE] was not legislative, but administrative, and might equally well have been vested by law in [other officials]." *New Orleans Waterworks Co.*, 125 U.S. at 32 (citations omitted).

In light of this analysis, the Court holds that Plaintiffs have failed "to allege the 'legislative action' threshold requirement." *Joubert-Vazquez*, 820 F. Supp. 2d at 297-298. In its main Opposition, "Plaintiffs urge the Court, without supporting legal authority, to overlook such a fatal deficiency and to focus on the fact that" Defendants acted pursuant to their authority under Act No. 45.[26] *Id.; see also Futura Development of Puerto Rico v. Estado Libre Asociado de Puerto Rico*, 276 F.Supp.2d 228, 241 (D.P.R. 2003) (denying a Contract Clause claim challenging non-legislative conduct). Since Defendants' actions did not involve an exercise of legislative power, this Court hereby dismisses Plaintiffs' Contract Clause claim.[27]

---

[26] Since Plaintiffs failed to provide any relevant analysis or legal authority in support of their position, it follows that Defendants' main argument was basically unopposed. Plaintiffs' only relevant argument is conclusory, lacks legal support, and is devoid of any substance. *See* Docket No. 41 at 28 ("The above summarized acts are not merely the enforcement of already-existing regulations, but rather delve into a wide array of powers delegated to Defendants by . . . Act No. 45 . . . .[and, thus,] such actions are to be considered an exercise of "legislative power" that the Contracts Clause is specifically designed to police.").

[27] The Court also notes that it is not entirely clear that the challenged guidelines substantially impaired Plaintiffs' contractual obligations with the CFSE. It would seem that what Plaintiffs are really alleging is the impairment of their contracts' performance. *See* Docket No. 28 at 33-34. This issue was neither raised nor briefed by either party.  But, to the extent that the Complaint really alleges an impairment of the performance of the contracts, Plaintiffs' claim should also be dismissed because it would not implicate the Contract Clause and our Constitution does not provide a federal action for simple breach of contract.

VII.    Puerto Rico law claims

The parties did not address the merits of Plaintiffs' state law claims. *See* Docket No. 30 at 66 and Docket No. 41 at 31. Instead, Defendants only asked this Court to refuse to exercise its supplemental jurisdiction over such claims. *See* Docket No. 30 at 66. Since there are still federal claims pending, the Court will not dismiss Plaintiffs' state law claims at this moment and will not address their merits without proper briefing.

CONCLUSION

In view of the foregoing, Defendants' Motions to Dismiss are GRANTED in part and DENIED in part. Plaintiffs' substantive due process, equal protection, and contract clause claims are hereby dismissed *with prejudice*. Similarly, Plaintiffs' First Amendment retaliation claim is dismissed *with prejudice* only as to Defendants Lastra-Gonzalez, Diaz-Trancon, Rivera-Serrano, and Colon-Grau.  Therefore, Defendants' Motion to Dismiss Plaintiffs' First Amendment claim, Docket No. 30, is denied as to the CFSE and Defendant Estrada. Finally, Defendants' Motions to Dismiss Plaintiffs' Sherman Act claims, Docket Nos. 30 and 44, are denied *without prejudice*. Defendants may refile a new motion to dismiss the antitrust claims so long as it complies with the specifications described in this Opinion and Order. Defendants will have until **Thursday, September 24, 2015** to renew their motion to dismiss. Plaintiffs, in turn, will have until **Tuesday, October 6, 2015** to file their opposition. No extensions of time and replies will be allowed.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 9th day of September, 2015.

s/ Jay A. Garcia-Gregory

JAY A. GARCIA-GREGORY
United States District Judge